UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

George Smith,

    Plaintiff,

        v.

Centurion of Vermont, LLC and
Jane Doe,

    Defendants.

Civil Action No. 5:20–cv–6

## REPORT AND RECOMMENDATION
(Doc. 54)

Plaintiff George Smith brings this civil action for violation of his constitutional rights under 42 U.S.C. § 1983 against Defendant Centurion of Vermont, LLC, a former health services contractor for the Vermont Department of Corrections (DOC).  Smith claims the medical care Centurion provided to him while he was incarcerated at the Northwest State Correctional Facility (NWSCF) was so inadequate that it violated his rights under the Eighth Amendment of the United States Constitution.  Pending before the Court is Centurion's Motion for Summary Judgment (Doc. 54).  For the reasons explained below, I recommend granting the Motion.

## Background

### I.    Relevant Facts

The facts stated below are taken from the parties' Statements of Undisputed/Disputed Material Facts and the attached exhibits.  (Doc. 54-1–54-23; Doc. 57-1–57-13.)  In accordance with the summary judgment standard, this Report and Recommendation construes the facts in the light most favorable to Smith.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)

(holding that on summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor").

While taking out the trash at his home on January 3, 2019,[1] Smith slipped on ice and fell, injuring the index and ring fingers of his right hand.[2]  (Doc. 57-3 at 4; Doc. 57-8 at 3.)  The next day, he visited his primary care provider, Family Nurse Practitioner Megan O'Brien of Community Health Centers of Burlington, who observed that Smith's right hand was "throbbing"; "some pus" was draining from his right ring finger; and Smith was "unable to move his [right] pinky, ring, and index finger[s]."  (Doc. 57-4 at 2; *see* Doc. 57-3 at 7.)  After examination, O'Brien advised Smith to take Keflex and ibuprofen as needed; x-rays were ordered; and Smith was to return to the office pending the x-ray results.  (Doc. 57-4 at 4.)  X-rays were taken that day, revealing a "[d]orsally displaced fragment" of Smith's right ring finger. The x-ray report did not mention his right index finger.  (Doc. 57-6 at 2.)  Smith's ring finger was splinted and wrapped, and he was advised to return for therapy on his hand once healing began.  (Doc. 54-9 at 4–7; Doc. 57-3 at 8–9; Doc. 57-8 at 3.)

---

[1]  Unless otherwise noted, all dates in this Report and Recommendation refer to the year 2019.

[2]  The Amended Complaint alleges that Smith's fall occurred on "New Year's Eve, 2018," (Doc. 26 at 2), but in his September 2021 deposition, Smith stated that in fact the fall occurred on January 3, 2019 (Doc. 57-3 at 4). Centurion contends the date of injury was December 31, 2018, as pleaded in the Amended Complaint.  (*see* Doc. 54-1 at 1 n.1).  Given that all justifiable inferences on summary judgment are "to be drawn in [the nonmovant's] favor," *Anderson*, 477 U.S. at 255, this Report and Recommendation accepts January 3 for purposes of recommending a disposition on Centurion's Motion for Summary Judgment.  The Court notes, however, that there is record evidence suggesting that the injury occurred earlier than January 3.  Specifically, a January 4, 2019 treatment record from Community Health Centers of Burlington notes the "onset date" of Smith's injury as December 29, 2018.  (Doc. 57-4 at 2.)  According to the same January 4 treatment note, Smith reported that his ring finger was "draining some pus," (*id.*), and Family Nurse Practitioner Megan O'Brien noted "purulent drainage" of Smith's ring finger (*id.* at 4). However, both treating physicians Dr. Daniel Holloway (Doc. 54-4 at 14) and Dr. Jay Stearns (Doc. 57-5 at 5) testified that pus would not drain from an injury like Smith's until at least two days after the injury, suggesting that Smith's finger injuries likely would have been sustained on January 2 or earlier.  Nevertheless, this issue does not constitute a genuine dispute of material fact because whether Smith sustained his finger injuries on December 31, 2018 or January 3, 2019 does not affect my recommendation.  *See Anderson*, 477 U.S. at 248 ("Only disputes over facts that might affect the outcome of the suit . . . will properly preclude the entry of summary judgment[;] [f]actual disputes that are irrelevant or unnecessary will not be counted.").

On January 14, Smith was arrested on a charge of domestic assault and incarcerated at NWSCF. (Doc. 54-5 at 11; Doc. 57-3 at 9.) He met with nursing staff[3] at the facility that same day. Nursing staff noted that, among other mental health and physical issues, Smith had a "finger splint in place" and "report[ed] he slipped on ice and broke [his] ring finger on [his] right hand." (Doc. 54-10 at 2.) About ten days later, on January 25, nursing staff received Smith's medical records from Community Health Centers of Burlington documenting the care provided to Smith on January 4. (Doc. 54-12.) On January 29, Daniel Holloway, MD signed the records, apparently indicating his receipt of them. (*Id.* at 2; *see* Doc. 57 at 4; Doc. 57-1 at 5.)

During his first two weeks in custody, Smith filed several "sick slips" requesting medical care for anxiety, seizures, a foot injury, and bathroom concerns, but none regarding his fingers. (Doc. 54-5 at 11, ¶¶ 10–14.) He was seen by nursing staff on January 27 and 29, respectively, regarding his foot injury and bathroom concerns. (*Id.* ¶¶ 13, 15.) On February 4, Licensed Practical Nurse Heather Ripley met with Smith in response to a sick slip about his finger injuries. (Doc. 54-18 at 3–4; Doc. 57-7 at 28–29.) Nurse Ripley noted that Smith complained of "pain and swelling in right index finger" and that Smith's finger was "quite swollen at the middle joint." (Doc. 54-18 at 3.) Smith was referred to a medical provider. (*Id.*)

Two days later, on February 6, Advanced Practice Registered Nurse Teri March met with Smith and noted that he was wearing a metal splint on his fourth finger and was having "pain and limited motion" in his index finger. (*Id.* at 5.) X-rays were ordered. (*Id.* at 7.) X-rays were

---

[3] In this context, "nursing staff" refers to Centurion medical staff members who are not considered "medical providers," including registered nurses, licensed nursing assistants, and mental health professionals. A "medical provider," as used in this Report and Recommendation, "refers to a doctor, physician's assistant, or nurse practitioner." (Doc. 57 at 3 n.3.) Unless otherwise noted, nursing staff and medical providers referenced in this Report and Recommendation were employed by Centurion and working at NWSCF during the relevant period.

taken on February 8, revealing fractures of the index middle phalanx and ring finger distal phalanx with no displacement.  (*Id.* at 12.)  Nurse March reviewed the x-rays on February 12. (*Id.* at 13.)  Approximately two weeks later, on February 27, Nurse Ripley saw Smith again in response to a February 25 sick slip (Doc. 57-7 at 49), and noted that Smith's index finger "remains swollen," again referring him to a medical provider "for follow up."  (*Id*. at 50.)  The next day, Dr. Holloway met with Smith and noted that his right ring finger was splinted and his right index finger had limited range of motion with moderate swelling over the middle joint and some tenderness.  (Doc. 54-18 at 14.)  Dr. Holloway reviewed the x-rays, ordered additional x-rays, and noted that he would refer Smith to an orthopedic specialist.  (*Id.*)  X-rays were ordered the next day and taken on March 4.  Nurse March reviewed the x-rays on March 5.  (Doc. 57-7 at 55, 56, 59.)

On March 12, in accordance with Dr. Holloway's referral, Smith met with Timothy Balise, PA, of Northwestern Orthopaedics & Rehab Center.  (Doc. 54-18 at 22–24.)  PA Balise noted that Smith had a "bony mallet of the fourth digit" but the x-ray revealed that "the fragment is well-corticated[4] consistent with subacute presentation," meaning it was too late to provide any acute interventions.  (*Id.* at 23.)  The plan was for Smith to "buddy tape" the second and third fingers in a "dynamic splint" and "have him work on restoring range of motion."  (*Id.*)

On April 10, Smith was seen by Jay Stearns, MD, who noted that Smith's right index finger was "still painful and unable to bend."  (*Id.* at 26.)  Dr. Stearns recorded that he had

---

[4] Physician Assistant Jessica Savoy, whose treatment of Smith is detailed below in this Report and Recommendation, described the term "well corticated" to mean "not new" or "a chronic injury . . . that . . . has been there for a while."  (Doc. 57-9 at 9.)

spoken about Smith with "Dr. Peter Short," a "hand surgeon [at] Fletcher Allen Hospital,"[5] and that "[t]here may be entrapment of the flexor tendon," in which case "corrective surgery would be indicated to restore full function, which is now limited." (*Id.*) Dr. Stearns referred Smith for another outside orthopedic appointment. (*Id.*)

That appointment occurred approximately six weeks later, on May 22, when Smith met with Jessica Savoy, PA, of Northwestern Medical Center. (*Id.* at 29–32.) Upon examination of Smith and review of the x-rays, PA Savoy assessed that Smith had "[a]cquired mallet deformity" of the right ring finger and "[s]prain of [the] interphalangeal joint of [the] right index finger." (*Id.* at 32.) She noted that both conditions were chronic. PA Savoy opined that, although Smith "may have done well with" surgery on his ring finger "at the time of injury," it was too late "[four] months out from the injury" because "the fracture fragment is well-corticated" and thus she "d[id] not suspect [Smith] would benefit from any acute surgical intervention" and in fact surgery "would only increase his pain and stiffness." (*Id.*) PA Savoy further opined that Smith would "certainly develop arthritis in th[e] joint [of his right ring finger] and may at some point require a fusion for pain control." (*Id.*) Regarding Smith's right index finger, PA Savoy noted that there was "a volar plate avulsion fracture," and surmised that Smith would "always have a cosmetic deformity and some degree of swelling and likely stiffness in this joint," but that "oftentimes you can see improvements in the symptoms for up to [one] year post[-]injury." (*Id.*) PA Savoy offered Smith no treatment plan for his right ring finger but "encouraged him to wrap the joint [at his right index finger] for compression" and recommended range-of-motion

---

[5] Centurion's expert, orthopedic surgeon Joseph McLaughlin, MD, stated in his November 2021 evaluation of this case that he did not believe there was a "Dr. Short" who would have been consulting on particular hand/finger patients during the relevant period. Dr. McLaughlin surmised that, "[m]ost likely," Dr. Stearns spoke with "one of the University of Vermont resident orthopedic physicians name[d] Dr. Peter Shorten," who at the time was "in the midst of standard general orthopedic training and was not a subspecialty hand surgeon." As of the date of Dr. McLaughlin's evaluation, he believed that Dr. Shorten was a "spine surgeon." (Doc. 54-15 at 7.)

exercises on that finger. (*Id.*) Smith agreed to follow up with PA Savoy "on an as-needed basis." (*Id.*)

## II.    Procedural History

On January 13, 2020, Smith filed a Complaint against Centurion and former DOC Commissioner Michael Touchette, asserting that Centurion and Touchette "[n]eglected [to provide the] care necessary [for his fingers] to [h]eal [and] [r]ecover." (Doc. 5 at 4.) Smith sought $2,000,000 in monetary damages as well as $1,000 per day "for every day [that] [n]urses [and the] DOC . . . [n]eglected previous orders prescribed by [d]octors and [p]hysical therapy [r]ecovery [p]lans." (*Id.* at 5.) Centurion and Touchette filed a Motion to Dismiss the Complaint, which the Court granted in part, with leave to amend. (*See* Docs. 15, 16, 23.) In its Order granting the Motion to Dismiss, the Court appointed counsel for Smith on the grounds that "[Smith] may raise a claim that is likely of substance, [and] analysis and presentment by counsel will assist the court in evaluating th[at] claim[]." (Doc. 23 at 21.)

On February 16, 2021, Smith filed his Amended Complaint, in which he alleged that "Centurion acted with deliberate indifference to Mr. Smith's serious medical needs by implementing policies that elevated profit over patient care, delaying Mr. Smith's access to proper and timely evaluation, referral and treatment, when Mr. Smith's condition required treatment to be provided on an expedited basis in order to be effective." (Doc. 26 at 7, ¶ 27.) The Amended Complaint further alleged that Centurion "acted with deliberate indifference to Mr. Smith's serious medical needs by implementing purchasing policies that deprived prisoners of access to critical medical supplies, and left Mr. Smith without the splint he needed." (*Id.*) Smith claims this conduct violated his Eighth Amendment right to be free from cruel and unusual punishment, and caused him to suffer from permanent physical injuries, pain, suffering,

loss of enjoyment of life, and the partial permanent loss of function in his dominant hand.  (*Id.* ¶ 29.)  Smith seeks compensatory and punitive damages, costs, and "such other relief as . . . the Court may find him to be reasonably entitled."  (*Id.* at 8.)

On January 14, 2022, Centurion filed the pending Motion for Summary Judgment, a Statement of Undisputed Material Facts, and attached exhibits.  (Docs. 54, 54-1–54-23.)  Smith filed an Opposition to the Motion, a Statement of Disputed Material Facts, and attached exhibits. (Docs. 57, 57-1–57-13.)  Centurion filed a Reply with two attached exhibits.  (Docs. 58, 58-1– 58-2.)

## **Analysis**

### I.    **Summary Judgment Standard**

A motion for summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "The moving party is entitled to summary judgment where 'the [nonmoving party] has failed to come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor' on an essential element of a claim on which the [nonmoving party] bears the burden of proof."  *Jean-Laurent v. Wilkerson*, 461 F. App'x 18, 22 (2d Cir. 2012) (quoting *In re Omnicom Grp., Inc., Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010)). In considering a motion for summary judgment, the court is "required to resolve all ambiguities and draw all factual inferences in favor of the nonmovant."  *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (internal quotation marks omitted).

If the moving party demonstrates that there are no genuine issues of material fact, the burden shifts to the nonmoving party, who must present "'significantly probative supporting evidence' of a disputed fact."  *Hamlett v. Srivastava*, 496 F. Supp. 2d 325, 328 (S.D.N.Y. 2007)

(quoting *Anderson*, 477 U.S. at 249). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). He "cannot defeat summary judgment by relying on the allegations in his complaint, conclusory statements, or mere assertions that affidavits supporting the motion are not credible." *Hamlett*, 496 F. Supp. 2d at 328 (citing *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir. 1996)); *see Dasher v. N.Y.C. Police Dep't*, No. 94 CV 3847(SJ), 1999 WL 184118, at *1 (E.D.N.Y. Mar. 18, 1999) ("[T]he court should grant summary judgment where the nonmoving party's evidence is merely colorable, conclusory, speculative, or not significantly probative.").

## II.    Section 1983 Claim Against Centurion

Smith brings this action under 42 U.S.C. § 1983, which provides a civil claim for damages against "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws . . . ." 42 U.S.C. § 1983. "The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." *Wyatt v. Cole*, 504 U.S. 158, 161 (1992). "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Thomas v. Roach*, 165 F.3d 137, 142 (2d Cir. 1999) (citing *Okla. City v. Tuttle*, 471 U.S. 808, 816 (1985)). To succeed on a § 1983 claim, a plaintiff must establish that "(1) the defendant acted under color of state law; and (2) as a result of the defendant's actions,

the plaintiff suffered a denial of her federal statutory rights, or her constitutional rights or privileges." *Annis v. County of Westchester*, 136 F.3d 239, 245 (2d Cir. 1998).

The Amended Complaint alleges that Centurion was acting "under color of state law" with respect to its acts and omissions at issue in this lawsuit, and that Centurion violated Smith's Eighth Amendment right against cruel and unusual punishment. (Doc. 26 at 6, ¶ 24; *see id.* at 7, ¶¶ 26–27.) Assuming that Centurion was acting under color of state law in its provision of medical care to prisoners on behalf of the State of Vermont, *see Chinnici v. Centurion of Vermont, LLC*, Civil Action No. 2:16-cv-264-wks-jmc, 2018 WL 6002116, at *9 (D. Vt. Oct. 10, 2018) (citing *Sherlock v. Montefiore Med. Ctr.*, 84 F.3d 522, 527 (2d Cir. 1996)), *report and recommendation adopted*, 2018 WL 6002347 (Nov. 15, 2018), Centurion may not be liable under § 1983 for the constitutional torts of its employees "unless [Smith] proves that 'action pursuant to official . . . [Centurion] *policy* of some nature caused a constitutional tort.'" *Rojas v. Alexander's Dep't Store, Inc.*, 924 F.2d 406, 408 (2d Cir. 1990) (omission in original) (quoting *Monell v. Dep't of Soc. Serv. of the City of N.Y.*, 436 U.S. 658, 691 (1978)); *see Estiverne v. Esernio-Jenssen*, 910 F. Supp. 2d 434, 442 (E.D.N.Y. 2012) ("Like government employers, private employers who are found to be state actors are not responsible, under a theory of *respondeat superior*, for the constitutional torts of their employees."). Therefore, in order to prove Centurion's liability in this case, Smith must demonstrate: (1) a violation of Smith's rights under the Eighth Amendment, (2) the existence of a policy or custom of Centurion's "beyond merely employing . . . misbehaving [actors]," and (3) "a causal connection—an affirmative link—between [Centurion's] policy and the deprivation of [Smith's] constitutional rights." *Harper v. City of New York*, 424 F. App'x 36, 38 (2d Cir. 2011) (internal quotation marks omitted).

9

### A.    Eighth Amendment Violation

The Eighth Amendment "is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law," as "not every lapse in prison medical care will rise to the level of a constitutional violation." *Smith v. Carpenter*, 316 F.3d 178, 184 (2d Cir. 2003). The failure to adequately treat a prisoner's medical condition may constitute cruel and unusual punishment in violation of the Eighth Amendment only where a defendant acts with "deliberate indifference to [the prisoner's] serious medical needs." *Harrison v. Barkley*, 219 F.3d 132, 136 (2d Cir. 2000) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). "Deliberate indifference has two necessary components, one objective and the other subjective." *Cole v. Fischer*, 416 F. App'x 111, 113 (2d Cir. 2011).

### 1.    Objective Component of an Eighth Amendment Claim: "Sufficiently Serious" Medical Condition

To establish the first element of an Eighth Amendment claim, the alleged medical condition or deprivation of adequate medical care must be, "in objective terms, 'sufficiently serious.'" *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (quoting *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994)). Where inadequate medical care is alleged, the determination of whether this objective element is met involves two inquiries "tailored to the specific circumstances of each case." *Smith v. Carpenter*, 316 F.3d 178, 185 (2d Cir. 2003). The court must determine (1) "whether the prisoner was actually deprived of adequate medical care," and (2) "whether the inadequacy in medical care [wa]s sufficiently serious." *Salahuddin v. Goord*, 467 F.3d 263, 279, 280 (2d Cir. 2006). Inadequate medical care in the prison setting is "sufficiently serious" if it "creat[es] a risk of death, degeneration, or extreme pain." *Cole*, 416 F. App'x at 113 (internal quotation marks omitted); *see Chance*, 143 F.3d at 702 (serious medical condition exists where "the failure to treat a prisoner's condition could result in further

significant injury or the unnecessary and wanton infliction of pain" (internal quotation marks omitted)); *Wilson v. Seiter*, 501 U.S. 294, 298 (1991) ("[O]nly those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." (citation and internal quotation marks omitted)).

Thus, "a prisoner with a hang-nail has no constitutional right to treatment, but if prison officials deliberately ignore an infected gash, 'the failure to provide appropriate treatment might well violate the Eighth Amendment.'" *Harrison*, 219 F.3d at 137 (quoting *Chance*, 143 F.3d at 702). In determining whether a sufficiently serious medical condition exists, the Second Circuit has identified several factors for courts to consider, including "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Chance*, 143 F.3d at 702 (alteration in original) (internal quotation marks omitted).

"Courts in this Circuit, as well as in other jurisdictions, consistently have found that a broken finger is not sufficiently serious as a matter of law." *Colon v. City of New York*, No. 08 Civ. 3142(HB), 2009 WL 1424169, at *6 (S.D.N.Y. May 21, 2009); *see Ravenell v. Van der Steeg*, No. 05 CIV 4042 WHP, 2007 WL 765716, at *4 (S.D.N.Y. Mar. 14, 2007) ("Most courts have held that a broken finger does not constitute a serious medical need."); *Gaines v. Okpok*, No. 03 CV 5095(SLT)(LB), 2006 WL 1652654, at *4 (E.D.N.Y. June 9, 2006) ("A broken finger, without more, simply does not present a condition of urgency of the type that may produce death, degeneration[,] or extreme pain which correspondingly merits constitutional protection." (internal quotation marks omitted)); *Magee v. Childs*, No. CIV904CV1089GLSRFT, 2006 WL 681223, at *4 (N.D.N.Y. Feb. 27, 2006) ("[M]any courts have held that a broken

finger does not constitute a serious injury . . . ."), *report and recommendation adopted*, 2006 WL

1555588 (June 6, 2006); *Ruiz v. Homerighouse*, No. 01-CV-0266E(SR), 2003 WL 21382896, at

*3 (W.D.N.Y. Feb. 13, 2003) (fractured metacarpal not sufficiently serious); *Sonds v. St.*

*Barnabas Hosp. Corr. Health Servs.*, 151 F. Supp. 2d 303, 311 (S.D.N.Y. 2001) ("A bleeding

finger does not pose a substantial risk of serious harm.  Case law holds that the objective prong

of the deliberate indifference test is not satisfied even where a finger is broken."); *Bonner v.*

*N.Y.C. Police Dep't*, No. 99 Civ. 3207(AGS), 2000 WL 1171150, at *4 (S.D.N.Y. Aug.17, 2000)

(fact that plaintiff "still suffers discomfort" and "one of his fingers does not close" did not

constitute a sufficiently serious medical need (internal quotation marks omitted)); *Henderson v.*

*Doe*, No. 98 CIV. 5011(WHP), 1999 WL 378333, at *2 (S.D.N.Y. June 10, 1999) ("[C]onditions

that have failed to meet [the sufficiently serious] standard include . . . a broken finger . . . ."

(citation omitted)).

　　　　Only in "the rare case" have courts found that a broken finger may constitute a

sufficiently serious medical need.  *Figueroa v. Puerschner*, No. 13 Cv. 4309(JGK), 2015 WL

505406, at *5 (S.D.N.Y. Feb. 6, 2015); *see, e.g.*, *Leacock v. N.Y.C. Health Hosp. Corp.*, No.

03Civ.5440(RMB)(GWG), 2005 WL 1027152, at *5 (S.D.N.Y. May 4, 2005) (finding finger

injury sufficiently serious to defeat motion to dismiss where complaint alleged that plaintiff was

required to have surgery because she "was not given access to adequate medical treatment for a

period of nearly three months" and that plaintiff's finger was "damaged for the rest of [her] life"

(alteration in original) (internal quotation marks omitted)).

　　　　Recognizing the long line of cases finding that a broken finger generally does not merit

constitutional protection, Smith argues that his case is different because it presents more than

simply a broken finger.  He notes that "[p]rior to his incarceration, Mr. Smith was a talented

artist," and now he is left "scarcely able to hold a pen" and "has largely lost his ability to draw,"
as a result of his broken fingers. (Doc. 57 at 10.) However, Smith does not offer authority to
support this argument, and I am aware of none holding that the seriousness of a prisoner's
medical condition for purposes of the objective component of the Eighth Amendment deliberate-
indifference standard may be measured by the effect of the condition on the prisoner's ability to
engage in a particular hobby or interest.

Moreover, ample evidence in the record demonstrates that Centurion did not deprive
Smith of adequate medical care for his finger injuries. Generally, in cases such as this one
involving alleged delayed medical care, "the Second Circuit has reserved a finding of deliberate
indifference for extreme cases, such as: ignoring a life-threatening and fast-degenerating
condition for three days, delaying care as a form of punishment, or delaying major surgery for
over two years." *Summerville v. Faciuna*, No. 05-CV-6459 (CJS), 2009 WL 2426021, at *7
(W.D.N.Y. Aug. 6, 2009) (citing cases) (citations omitted). For example, in *Summerville* the
court found that "[a] fourteen-day wait for outside consultation regarding a condition that was
neither life-threatening nor fast-degenerating" did not meet the sufficiently serious standard,
"especially when [the inmate] received treatment and monitoring throughout that period." *Id.* at
*8. The court concluded that the inmate received adequate medical treatment because
defendants "did not ignore [his] complaints" about an insect in his ear and held that "[p]laintiff
has failed to show that objectively, the delay in seeing outside physicians or the denial of a
second follow-up appointment constitute a sufficiently serious deprivation of adequate medical
care." *Id.* at *7, *8; *see Santiago v. City of New York*, No. 98Civ. 6543(RPP), 2000 WL
1532950, at *6 (S.D.N.Y. Oct. 17, 2000) (holding that plaintiff failed to state a deliberate-
indifference claim because "he received medical treatment promptly after he complained of

13

pain").  The record demonstrates that Centurion nursing staff and medical providers did not ignore Smith's complaints, delay his medical care as a form of punishment, or delay major surgery.  Rather, providers were attentive in treating Smith's finger injuries given the particular circumstances of his case.

As described above, Smith was taken into custody approximately 11 days after he sustained his finger injuries and 10 days after he had received treatment for those injuries from his primary care provider and the hospital emergency room.  He met with Centurion nursing staff when he entered NWSCF, and it was noted that, among other medical issues, Smith had a finger splint in place and reported breaking his right ring finger.  Nursing staff requested Smith's medical records from the treatment provider he visited at the Community Health Center the day after he injured his fingers, and Centurion received those records about 10 days later.  Four days later, a medical provider signed the records indicating his receipt of them.  During those initial weeks of his incarceration, Smith submitted several sick slips and met with nursing staff on two occasions, but he did not complain about or seek treatment for his finger injuries.  When Smith eventually submitted a sick slip about his fingers, he was promptly seen by nursing staff and referred to a medical provider.  X-rays were ordered and taken.  Several days after that, nursing staff reviewed the x-rays.  About two weeks later, nursing staff met with Smith in response to a sick slip, and he was again referred to a medical provider.  Dr. Holloway met with Smith the next day, reviewed the x-rays, ordered additional x-rays, and referred Smith to an outside orthopedic specialist.  About two weeks later, Smith treated with PA Balise of Northwestern Orthopaedics & Rehab Center, who buddy-taped Smith's second and third fingers in a splint and advised him to work on range-of-motion exercises.  Smith met with Dr. Stearns a little under a month later, and Dr. Stearns recorded that he had spoken with a hand surgeon at Fletcher Allen Hospital.  The

surgeon opined that perhaps surgery was indicated.  Dr. Stearns referred Smith for another outside orthopedic appointment, which occurred approximately six weeks later, when Smith treated with PA Savoy of Northwestern Medical Center.  Savoy opined that it was too late for surgery and advised Smith to wrap his finger and perform range-of-motion exercises.

Based on these facts, a reasonable juror could not conclude that Smith was deprived of adequate care.  To the contrary, the facts show that from the date Smith entered NWSCF with his finger injuries, he received regular medical care, including multiple meetings with nursing staff, x-rays ordered and completed, appointments with three different facility medical providers, and referral to and appointments with two different orthopedic specialists.  Even if Centurion nursing staff and medical providers misdiagnosed Smith's finger injuries and should have referred him for surgery or to an orthopedic specialist sooner,[6] this would not rise to the level of an Eighth Amendment violation.  *See Estelle*, 429 U.S. at 106 ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment."); *Summerville*, 2009 WL 2426021, at *7 ("Negligent misdiagnosis does not rise to the level of an Eighth Amendment violation.").

Nevertheless, Smith has not come forward with evidence indicating that surgery—after the date of Smith's incarceration—would have likely helped Smith's finger injuries.  The closest Smith comes to establishing this point is expert PA Savoy's statement in a May 22 medical report that Smith "*may* have done well with percutaneous pinning[, i.e., surgery,] at the time of injury" (Doc. 54-6 at 18 (emphasis added)); and her deposition testimony that once a medical provider determines that surgery is necessary in a case like Smith's, the ideal time to perform

---

[6]  The Court notes that despite treating with his primary care provider and hospital emergency room staff on the day after he was injured, neither provider referred Smith for surgery or to an orthopedic specialist on either the date of treatment or on any date in the approximately 10-day period between that date, January 4, and Smith's incarceration on January 14.  (*See* Doc. 54-4 at 2–5; Doc. 54-5 at 3–9; Doc. 54-8 at 2; Doc. 54-9 at 3–8.)

that surgery is two weeks from the date of injury (Doc. 54-14 at 4–5).  When pressed, PA Savoy stated that "[y]ou could make an argument for [surgery being done] within the first three weeks" after the injury (*id.* at 4), and maybe even "three to four weeks" after (*id.* at 7), but "most surgeons would be hesitant to treat [Smith's finger injuries] operatively after [two weeks]" (*id.*). PA Savoy explained that, at three weeks post-injury, "you're really dealing with a fair amount of scar tissue[,] and certainly after a month, I don't suspect that most surgeons would recommend surgery at that point."  (*Id.*)  Therefore, even by Smith's expert's standards, Smith "*may*"—or may not—have "done well" with surgery (Doc. 54-6 at 18), and the ideal time for that surgery was before he was incarcerated or within the first few days of his incarceration.  Although PA Savoy suggested that surgery could have been performed as late as the third week of Smith's incarceration, i.e., the fourth week post-injury, Smith did not raise concerns about his finger injuries even though he was consulting with nursing staff during that period about mental health issues, seizure medication, a foot injury, and other ailments.

Furthermore, PA Savoy, who is not a surgeon, stated that she "tend[s] to defer to the surgeon[]" to determine when or if surgery would be beneficial in a particular case, and that there was never a time when she felt that surgery was indicated notwithstanding the surgeon's contrary conclusion.  (*See* Doc. 54-17 at 3.)  Centurion's expert, orthopedic surgeon Joseph McLaughlin, opined that Smith's finger injuries "likely always would have been managed nonoperatively," and that "many, if not most, hand surgeons would treat both [Smith's] index and ring finger injuries with splinting and then motion and exercises," as Smith's injuries were in fact treated.  (Doc. 54-15 at 8.)  Dr. McLaughlin explained that "[t]he risk of complication from surgical treatment of these fractures is quite high and it is for this reason that many surgeons will treat this nonoperatively."  (*Id.*)  Dr. McLaughlin concluded that the treatment Smith received in

the first four weeks after his injury was appropriate, stating: "I do . . . . believe that nonoperative care with full-time splinting is a very reasonable choice in this scenario." (*Id.* at 10.) Smith has not countered this evidence with probative evidence demonstrating that surgery or other care would have benefitted Smith at any time, let alone from a date after Smith was incarcerated and in the care of Centurion.

Therefore, Smith has not established that he had an objectively serious medical condition sufficient to form the basis of an Eighth Amendment violation. *See Bellotto v. County of Orange*, 248 F. App'x 232, 237 (2d Cir. 2007) (finding that prisoner "could not have been found to have received constitutionally inadequate care," where, "[u]pon intake, [she] was placed on close watch, and taken off only when it became apparent that she posed no risk to herself or others [and] [s]he saw a psychiatrist several days after her admission to the Jail, who took a detailed medical history and prescribed her with medication"); *Gaines*, 2006 WL 1652654, at *4 (finding that prisoner "fail[ed] to establish a deprivation of sufficient seriousness" to meet the objective component of deliberate indifference, where prisoner was "given ibuprofen, an ice pack, and a hand and wrist support, and was offered an opportunity to visit the clinic").

### 2.    Subjective Component of an Eighth Amendment Claim: "Deliberate Indifference"

Smith also has not established the subjective component of a deliberate-indifference claim. Under this prong of the analysis, the plaintiff must prove that "[a] prison official knew of and disregarded the plaintiff's serious medical needs." *Chance*, 143 F.3d at 703 (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). Deliberate indifference occurs when an official "knows that [an] inmate[] face[s] a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847. "[D]eliberate indifference entails something more than mere negligence . . . [but] something less than acts or omissions

[undertaken] for the very purpose of causing harm or with knowledge that harm will result." *Id.* at 835. The Second Circuit has explained that the following two situations do not constitute deliberate indifference to a plaintiff's serious medical needs: (1) "a delay in treatment based on a bad diagnosis or erroneous calculus of risks and costs," or (2) "a mistaken decision not to treat based on an erroneous view that the condition is benign[,] . . . trivial[,] or hopeless, or that treatment is unreliable, or that the cure is as risky or painful or bad as the malady." *Harrison*, 219 F.3d at 139.

Courts have held that courses of treatment similar to Smith's do not support an Eighth Amendment claim. For example, the Western District of New York found that, despite a prisoner's claim that a 15-day delay in treatment of his hand caused his bone to heal improperly and rendered him disfigured, the delay did not constitute deliberate indifference because plaintiff could not show that the defendant disregarded his serious medical needs when nursing staff and medical providers examined him one day after his injury, prescribed him pain medication, ordered orthopedic consultation for him, and sent him to the emergency room as soon as an x-ray report showed a fracture to his hand. *Rodriguez v. Ames*, 224 F. Supp. 2d 555, 563 (W.D.N.Y. 2002). Similarly, the Western District of New York concluded that a one-week delay in a prisoner's consultation with an orthopedist "did not constitute deliberate indifference" to the plaintiff's medical needs, despite his claim that the delay caused his metacarpal bone to heal improperly and rendered him disfigured. *Ruiz*, 2003 WL 21382896, at *3. The court noted that plaintiff was afforded immediate attention on the day he broke his hand, including receipt of a splint, ace bandage, and Ibuprofen. (*Id.*) Plaintiff was also scheduled to see an orthopedic specialist. *Id.* As *Ruiz* explained, "the Constitution does not command that inmates be given the kind of medical attention that judges would wish to have for themselves[;] [t]he essential test is

one of medical necessity and not one simply of desirability." *Id.* (second alteration in original) (internal quotation marks omitted).

Centurion contends that Smith cannot satisfy the subjective component of the deliberate-indifference analysis with respect to its medical treatment of Smith's finger injuries. (*See* Doc. 54 at 16–18.) As explained above, ample authority supports Centurion's position. Smith has not presented probative evidence to demonstrate a disputed issue as to whether the particular medical care Centurion provided for Smith's finger injuries constituted deliberate indifference to his serious medical needs. (*See* Doc. 57 at 8–11.) Even if Smith's finger injuries objectively could constitute a "sufficiently serious" medical condition for purposes of an Eighth Amendment violation, he has not raised an issue of material fact regarding whether Centurion subjectively acted with "deliberate indifference" regarding its treatment of Smith's fingers.

Smith has not come forward with evidence that Centurion personnel were aware of, let alone disregarded, his serious medical need. The evidence shows that Centurion medical personnel (a) noted Smith's finger splint and requested outside medical records upon Smith's entrance into NWSCF; (b) reviewed those outside medical records soon thereafter; (c) ordered and reviewed x-rays of Smith's hand on two occasions; (d) determined that a referral to an outside orthopedic provider was warranted; (e) facilitated an appointment with that provider where Smith's right index and middle fingers were "buddy taped" and Smith was given range-of-motion exercises for the index finger; (f) spoke to an outside resident orthopedic surgeon about Smith's fingers; (g) referred Smith to a second outside orthopedic appointment, and facilitated an appointment with that provider where Smith was encouraged to wrap the joint of his right index finger for compression and do range-of-motion exercises with that finger. At no point was Smith advised that surgery or any other treatment that was not provided to him would have benefitted

him.  Although PA Savoy stated that he "*may* have done well with percutaneous pinning *at the time of injury*," (Doc. 54-18 at 32 (emphases added)), "mere speculation and conjecture is insufficient to preclude the granting of [a] motion [for summary judgment]," *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001), and "evidence that *some* medical professionals would have chosen a different course of treatment is insufficient to make out a constitutional claim," *Petties v. Carter*, 836 F.3d 722, 729 (7th Cir. 2016).

Smith's contention that "surgical intervention would have benefited" him (Doc. 57 at 9) is, at most, "merely a difference of opinion with respect to a course of treatment," which "is not actionable under section 1983."  *Ruiz*, 2003 WL 21382896, at *4; *see Corby v. Conboy*, 457 F.2d 251, 254 (2d Cir. 1972) ("Allegations of mere negligence in the treatment of a prisoner's physical condition, or claims based on differences of opinion over matters of medical judgment, fail to rise to the level of a § 1983 violation."); *King v. Shinder*, No. 16-cv-06315 (PMH), 2020 WL 4750294, at *8 (S.D.N.Y. Aug. 17, 2020) ("A plaintiff's mere [d]isagreement over the proper treatment does not rise to the level of a constitutional violation." (alteration in original) (internal quotation marks omitted)); *Shedlock v. Dolan*, Civil Action No. 08-11969, 2010 WL 2106220, at *6 (D. Mass. May 26, 2010) (prisoner not denied adequate treatment where he requested surgery, but medical providers concluded nonsurgical course of treatment was "more appropriate" and prisoner was provided with regular medical appointments, consultations, and medications).

It is well established in this Circuit that "mere disagreement over the proper treatment does not create a constitutional claim," and "[s]o long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation."  *Chance*, 143 F.3d at 703.  As one district court has explained, "disagreements over

medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists or the timing of their intervention, are not adequate grounds for a Section 1983 claim[, as] [t]hese issues implicate medical judgments and, at worst, negligence amounting to medical malpractice, but not the Eighth Amendment." *Sonds*, 151 F. Supp. 2d at 312; *see also Swindell v. Supple*, No. 02Civ.3182RWS, 2005 WL 267725, at *8 (S.D.N.Y. Feb. 3, 2005) (holding that "denial of consultation with a specialist" in itself, does not constitute an act of medical indifference sufficient to make a valid Eighth Amendment claim).

Neither of the outside orthopedic specialists who treated Smith, including his expert witness PA Savoy, recommended in their treatment notes that Smith should undergo surgery on either of his fingers. Moreover, according to both PA Savoy's and Dr. McLaughlin's opinions, by the time Smith raised concerns about his fingers to Centurion, it would have been too late for surgical intervention. As discussed above, both PA Savoy and Dr. McLaughlin opined that if surgery might have helped, ideally it would have occurred within the first two weeks after the injury. During most of that two-week period, Smith was living on his own in the community and not under Centurion's care at NWSCF. Further, during that two-week period, Smith's community providers recommended neither an orthopedic consultation nor surgical intervention. (*See* Doc. 54-4 at 2–5; Doc. 54-8 at 2; Doc. 54-9 at 4–5.) Dr. McLaughlin's opinion that there were risks involved in any surgery on Smith's fingers, and the likelihood of success was unknown even if performed during the first two weeks of the injury, further undermines Smith's claim of deliberate indifference. *See Hernandez v. Keane*, 341 F.3d 137, 146–47 (2d Cir. 2003) (noting that plaintiff's "own expert . . . opined that surgery entailed the risk of doing more harm than good, and conceded that a decision to perform or not perform [the surgery] was purely an

issue of medical judgment," and finding that "[t]his is precisely the sort of issue that cannot form the basis of a deliberate indifference claim" (citation and internal quotation marks omitted)).

In sum, even if Smith could show that his finger injuries constituted a "sufficiently serious" medical condition, or that he was deprived of adequate medical care and that deprivation was "sufficiently serious," his failure to present evidence showing that Centurion acted with "deliberate indifference" with respect to his finger injuries is fatal to his § 1983 claim against Centurion. *See Hill v. Curcione*, 657 F.3d 116, 123 (2d Cir. 2011) ("Issues of medical judgment cannot be the basis of a deliberate indifference claim where evidence of deliberate indifference is lacking."); *Jones v. Lamont*, 379 F. App'x 58, 59 (2d Cir. 2010) (noting that "[d]eliberate indifference has two necessary components, one objective and the other subjective," and affirming grant of summary judgment where plaintiff submitted no evidence of defendants' "subjective awareness" that plaintiff was resistant to medication).

## B. Official Centurion Policy

Even assuming that its employees' conduct resulted in an Eighth Amendment violation, Centurion may only be liable under § 1983 if Smith can demonstrate that Centurion policy caused the unconstitutional conduct. *Rojas*, 924 F.2d at 408. Smith principally argues that it is disputed whether "Centurion's chronic understaffing and inefficient procedures led to unreasonably long delays in providing Mr. Smith with the care and treatment he urgently needed at the time he came into DOC custody." (Doc. 57 at 1; *see id.* at 9 ("[T]he chronic understaffing at Centurion, and the resulting delays in patient care, w[ere] the result of a conscious choice, constituting a custom or policy that was perpetuated in deliberate indifference to the serious medical needs of Vermont inmates.").)

As explained below, Smith has not presented evidence sufficient to permit a reasonable juror to find that Centurion had a policy of chronically understaffing its prison medical operations and employing deliberately inefficient procedures, both of which caused Smith to receive constitutionally inadequate medical care.

### 1.    Chronic Understaffing

As evidence of Centurion's chronic understaffing, Smith references four features of the staffing situation during the relevant time period: (1) there were just two physicians assigned to work at NWSCF in early 2019; (2) Dr. Holloway worked only one day per week at NWSCF during the relevant period; (3) Dr. Stearns, who started working at NWSCF in early February 2019, also worked only one day per week during the relevant period; and (4) the only other qualified provider who was on duty at NWSCF during the relevant period was Nurse March, who worked only two days per week in 10-hour shifts.  (Doc. 57 at 8; Doc. 57-12 at 5.)  Smith has not provided any evidence or law to support the claim that Centurion's staffing formula was insufficient to provide adequate medical care.  In support of his claim, Smith offers the deposition testimony of Lura Borrows that she "fe[lt] like [NWSCF] was understaffed" "[a]t times" (Doc. 57-10 at 3); she "believe[d]" there was only a doctor at NWSCF "a couple of days a week" (*id.*); and "sometimes probably providers run a bit behind [at NWSCF]" (*id.* at 4).  Smith also offers the testimony of Dr. Stearns, who felt that NWSCF "could have used more" medical providers and that NWSCF's inefficient computer system created a staffing shortage.  (Doc. 57-5 at 7.)  These unsubstantiated opinions are not sufficient to establish a disputed material fact.

By contrast, Centurion has submitted evidence demonstrating that (a) NWSCF's staffing levels are set by the Vermont DOC, not in accordance with any policy or custom of Centurion; and (b) according to those DOC requirements, NWSCF's staffing levels were appropriate in

January 2019. (*See* Doc. 58-2 at 8–10, 32.) Specifically, Centurion has submitted a report

issued by CGL,[7] the facility maintenance and management services company charged with

evaluating corrections health care in Vermont, in which CGL stated: "The [DOC's] contract with

Centurion designates the specific staffing pattern required at each facility. The staffing matrix

has been developed by [the] []DOC over time, with adjustments as dictated by changes in the

system, such as facility closures or emerging needs." (*Id.* at 8–9.) The report evaluated the

staffing levels at individual Vermont correctional facilities, including NWSCF, and reported that,

as of January 2019, NWSCF was allotted 10 hours per week of physician time and 22 hours per

week of advanced practice registered nurse (APRN) time. (*Id.* at 32.) Smith has not produced

evidence demonstrating that the staffing levels at NWSCF during the period relevant to this

lawsuit were below these allotments. *See Mathews v. Pallito*, No. 5:12-cv-58, 2014 WL

4805333, at *8 (D. Vt. Sept. 26, 2014) (finding no basis for § 1983 liability against company

providing health and medical services to inmates pursuant to state contract, where plaintiff "has

not advanced evidence of any . . . custom or policy" to deprive prisoner of medical care). In

light of the CGL report's statement that DOC sets staffing levels at facilities, Smith cannot

establish that Centurion custom or policy was responsible for staffing levels.

---

[7] CGL's January 15, 2019 report, "Vermont Department of Corrections: Assessment of Health Care System Costs," is admissible under Federal Rule of Evidence 803(8) as a public record. The cover page of the report indicates that it was prepared for the "State of Vermont Legislative Joint Fiscal Office." The Legislative Joint Fiscal Office was created under 2 V.S.A. § 521 "as a permanent agency to provide the General Assembly with services relating to the fiscal operations of the State, including revenues, budgeting, and expenditures." Although new evidence generally may not be introduced in a reply brief, "[a] district court enjoys broad discretion . . . to rely on evidence submitted with the reply papers," *Compania Del Bajo Caroni (Caromin), C.A. v. Bolivarian Republic of Venezuela*, 341 F. App'x 722, 724 (2d Cir. 2009), particularly where the new evidence "respond[s] to various factual assertions made . . . in opposition to the motion for summary judgment," *Kelly v. Times/Rev. Newspapers Corp.*, No. 14-CV-2995 (JMA)(SIL), 2018 WL 1701999, at *7 (E.D.N.Y. Feb. 15, 2018), *report and recommendation adopted*, 2018 WL 1701945 (Mar. 31, 2018). *See Fersel v. Paramount Med. Servs., P.C.*, No. 18-CV-2448 (AMD) (ARL), 2022 WL 1019059, at *12 n.16 (E.D.N.Y. Feb. 28, 2022) ("The defendant's reply and its exhibits do not raise any new arguments, but instead respond to various factual assertions made by [the plaintiff] in opposition to the motion for summary judgment . . . ." (alteration in original) (internal quotation marks omitted)). The Court considers the CGL report because it was submitted in response to factual assertions in Smith's Opposition to Centurion's Motion for Summary Judgment regarding staffing at NWSCF during the relevant period.

24

2.    **Inefficient Procedures**

Smith further contends that "Centurion's inefficiencies meant that there were often long delays before an inmate would see a provider." (Doc. 57 at 8.)

Undue delay in the provision of health care may rise to the level of deliberate indifference. *See, e.g.*, *Hathaway v. Coughlin*, 841 F.2d 48, 50 (2d Cir. 1988) (allegations of delay of two years in arranging surgery to correct broken pins in plaintiff's hip sufficient to preclude summary judgment); *Archer v. Dutcher*, 733 F.2d 14, 16 (2d Cir. 1984) (allegations of delay of several days while pregnant plaintiff was suffering extreme pain and bleeding precluded summary judgment). In this case, however, Smith has not come forward with evidence of undue delay causing a constitutional violation. In support of his position regarding inefficient procedures at NWSCF, Smith references Dr. Stearns's testimony about problems with Centurion's computer system which, in Dr. Stearns's opinion, caused delays in inmates being seen by medically qualified personnel and in inmates obtaining referrals to outside providers. Specifically, Dr. Stearns testified that NWSCF's computer system was "inefficient" and "delay[ed]" inmates seeing providers due to "unnecessary amounts of paperwork, [making it] very hard to look at old records."[8] (Doc. 57-5 at 6.) This testimony, however, does not demonstrate that Centurion implemented or endorsed a policy or custom involving inefficient computer systems. *See Rojas*, 924 F.2d 408 ("Private employers are not liable under § 1983 . . . unless the plaintiff proves that action pursuant to official . . . *policy* of some nature caused a constitutional tort." (second omission in original) (citations and internal quotation marks omitted)); *Vippolis v. Village of Haverstraw*, 768 F.2d 40, 44 (2d Cir. 1985) ("The plaintiff must

---

[8] Dr. Stearns also testified that at NWSCF, "rather than do a physical on . . . what seems to be a healthy person, . . . they would have you see the sicker [patients] first" (Doc. 57-5 at 6); and that, "normally you can see at least 15, 18 patients in a simple outpatient clinic like a prison where people aren't that sick[,] [b]ut we were down to 7 to 10 [patients] in 10 to 12 hours [at NWSCF]" (*id.* at 7).

first prove the existence of a municipal policy or custom in order to show that the municipality took some action that caused his injuries beyond merely employing . . . misbehaving [employees].").

### C.  Causation

Even if Smith had shown that Centurion had a policy or custom of chronic understaffing or employing inefficient computer procedures at NWSCF, he has not raised an issue of fact that this understaffing or inefficiency *caused* constitutional harm to Smith.  *See Mathews*, 2014 WL 4805333, at *5 ("Mathews ha[d] not shown that any delay in receiving diabetic shoes caused the harm that he complains of.") (citing cases); *Askew v. Davis*, 613 F. App'x 544, 547 (7th Cir. 2015) ("[E]ven if Askew was in pain from diabetic neuropathy when he first requested the shoes, nothing in the record suggests that his shoes were the cause."); *Ruiz*, 2003 WL 21382896, at *3 ("[Prisoner's] *unsubstantiated* claim that the one-week delay [in prisoner's consultation with an orthopedist] caused a degeneration in his condition is inadequate to bar summary judgment."). Without a demonstrated causal connection between a Centurion policy or custom and the deprivation of Smith's constitutional rights, Centurion may not be liable under § 1983.  *Vippolis*, 768 F.2d at 44 ("[A]n official policy or custom must be shown to be the cause of the deprivation of constitutional rights."); *see Napier v. Madison Cnty., Ky.*, 238 F.3d 739, 743 (6th Cir. 2001) (holding that, in order to show a constitutional violation based on alleged delay in treatment, prisoner must "offer[] . . . medical evidence to show that he suffered a detrimental effect from being kept from his scheduled [medical treatment]"); *Sealock v. Colorado*, 218 F.3d 1205, 1210 (10th Cir. 2000) (holding that "[d]elay in medical care only constitutes an Eighth Amendment violation where the plaintiff can show that the delay resulted in substantial harm").

The only evidence that could support Smith's claim that Centurion's alleged chronic understaffing and inefficiencies caused "greatly diminished functioning in Mr. Smith's right hand" (Doc. 57 at 9), is the opinion of PA Savoy that Smith "may have done well with percutaneous pinning at the time of injury" (Doc. 54-6 at 18), within two weeks of the injury (Doc. 54-14 at 4), or possibly but less likely within "three to four weeks" of the injury (*id.* at 7). As discussed above, however, PA Savoy's speculative statements on the issue are inadequate to withstand summary judgment. *See Dasher*, 1999 WL 184118, at *1. Moreover, the probative value of these statements is further limited by PA Savoy's testimony that she generally defers to a surgeon to determine when or if surgery would be beneficial in a particular case (*see* Doc. 54-17 at 3). Dr. McLaughlin, an orthopedic surgeon, opined that many if not most hand surgeons would have treated Smith's finger injuries nonoperatively with splinting and range-of-motion exercises (*see* Doc. 54-15 at 8), as Smith's injuries were in fact treated. Smith has not shown that (a) had his medical records been reviewed sooner, x-rays been ordered and reviewed sooner, a meeting with a medical provider occurred sooner, or a referral to an orthopedic specialist had been placed earlier, (b) he would have received surgery or other treatment that he did not receive, and (c) that surgery or other treatment likely would have resolved or reduced his finger injuries.

Therefore, Smith has not raised an issue of fact that Centurion's alleged policies or customs caused him constitutional harm.

## Conclusion

After review of the record evidence, I find that Smith has not presented evidence "sufficient to permit a reasonable juror to return a verdict in his . . . favor on an essential element" of his claims. *Wilkerson*, 461 F. App'x at 22 (internal quotation marks omitted). Specifically, the evidence is insufficient to demonstrate that Centurion violated the Eighth

Amendment by acting with deliberate indifference to Smith's serious medical needs, or by employing prison staffing and other policies that caused him to receive constitutionally inadequate medical care due to unreasonably long delays in the provision of services. Therefore, I recommend that Defendant's Motion for Summary Judgment (Doc. 54) be GRANTED.

Dated at Burlington, in the District of Vermont, this 13th day of September 2022.


*/s/ Kevin J. Doyle*
Kevin J. Doyle
United States Magistrate Judge



Any party may object to this Report and Recommendation within 14 days after service thereof, by filing with the Clerk of the Court and serving on the Magistrate Judge and all parties, written objections that shall specifically identify those portions of the Report and Recommendation to which objection is made and the basis for such objections. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2); L.R. 72(c). Failure to timely file such objections "operates as a waiver of any further judicial review of the magistrate's decision." *Caidor v. Onondaga Cnty.*, 517 F.3d 601, 604 (2d Cir. 2008) (quoting *Small v. Sec'y of Health & Hum. Servs.*, 892 F.2d 15, 16 (2d Cir. 1989)).